JOSEPH N. RADEMAKER AND ANOTHER v.
ARCHER DANIELS MIDLAND COMPANY.
CUDDY PLUMBING & HEATING COMPANY, INC.,
THIRD-PARTY DEFENDANT.

247 N. W. 2d 28.

September 3, 1976—No. 46364.

*Dennis R. Peterson,* for appellants.

*Popham, Haik, Schnobrich, Kaufman & Doty* and *G. Marc Whitehead,* for respondent defendant.

*Bey, Ochs & Klimek* and *Norman W. Larsen,* for respondent third-party defendant.

Heard before Kelly, Yetka, and Marsden, JJ., and considered and decided by the court en banc.

DAVID E. MARSDEN, JUSTICE.*

We are required in this case to reconcile two legal tests which have developed independently in our precedents for establishing the existence of an employment relationship, the right to control test which has been applied to distinguish employees from independent contractors and the employee's consent test which has been applied specifically in the loaned employee context.

Plaintiff Joseph N. Rademaker was employed by Cuddy Plumbing & Heating Company, Inc., as an apprentice steamfitter. Archer Daniels Midland Company (ADM) engaged Cuddy to install certain plumbing on a linseed oil processing plant being constructed by ADM. Rademaker was part of the Cuddy crew assigned to work on this project. At the time of this accident, Rademaker had been working on the ADM project for approximately 1½ years, although it appears that he may have been tem-

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

porarily shifted by Cuddy to different jobsites on numerous occasions during this period. Both Rademaker and Cuddy understood that the details of the work on the ADM project would be controlled by Fankhauser, an ADM employee. On October 4, 1971, Fankhauser directed Rademaker to drill a vent hole in a pipe. As Rademaker was drilling, an explosion occurred. Hexane gas had apparently accumulated in the area and had been ignited by sparks from the drill. Rademaker was burned in the fire which followed the explosion.

After collecting workers' compensation benefits from Cuddy's insurer, Rademaker sued ADM in tort, alleging negligence in allowing accumulation of the hexane gas. ADM answered, in part, that the accident was caused by the negligence of "others over whom this defendant exercised no control or right of control." ADM then brought Cuddy in as a third-party defendant, alleging that Cuddy "was in sole charge of the performance and execution of the work." ADM was subsequently granted leave to amend its answer and plead affirmatively that Rademaker was a loaned employee subject to ADM's control. If proven, this affirmative defense would have the consequence of making ADM a special employer, responsible for workers' compensation but immune from tort liability. Both parties agreed that this issue was ripe for summary judgment and submitted it to the trial court for determination. The trial court determined that Rademaker was a loaned employee and ordered summary judgment in favor of ADM.

I.

The principal basis for the trial court's determination here was ADM's right to control the details of Rademaker's work. Both parties appear to have agreed in their arguments to the trial court that the control test was determinative, Rademaker arguing that ADM lacked the requisite control because (1), under Minn. St. 326.48, Rademaker could only have been supervised by a licensed steamfitter, which would include the foreman of the Cuddy crew but exclude Fankhauser, and (2), apart from

the statute, the facts show that Rademaker received his orders from the Cuddy supervisor rather than Fankhauser. Were we to agree that the control test was determinative, we would not hold that the trial court erred in rejecting these arguments. However, we do not agree that the control test is determinative.

In Darvell v. Paul A. Laurence Co. 239 Minn. 55, 59, 57 N. W. 2d 831, 834 (1953), we emphasized our adherence to the rule that when an employee's rights will be affected by characterization as a loaned employee, his consent to the special employment relationship is essential. The following quotation from our Darvell opinion emphasizes the strength of our commitment to this principle of law as it has developed in earlier cases:

"In the case of Crawford v. D. M. & I. R. Ry. Co. 220 Minn. 225, 229, 19 N. W. (2d) 384, 387, the court stated:

"'* * * A new master cannot be foisted upon a servant unwittingly. The right to select one's employer is implicit in freedom from involuntary servitude. An employer may loan his employe to another so that for the time being the employe becomes the servant of the latter, but this can be done only with the employe's assent.'

"In the case of Pocrnich v. Snyder Min. Co. 233 Minn. 81, 84, 45 N. W. (2d) 794, 796, the court again stated:

"'* * * An employer, however, may transfer an employe to another employer so that for a time the latter becomes the employer if such transfer is made with the knowledge and consent of the employe. * * *

"'The consent to such transfer need not be expressed. If it be established that an employe thus transferred had or acquired knowledge of the substitution of employers and thereafter, with such information in mind, continued under the new employer, he will be deemed to have accepted such new employer, at least during the period subsequent to such knowledge and continued employment.'

"Other cases with like holdings are Yoselowitz v. Peoples Bakery, Inc. [201 Minn. 600, 277 N. W. 221]; Benson v. Lehigh

Valley Coal Co. 124 Minn. 222, 144 N. W. 774, 50 L. R. A. (N.S.) 170; Dahl v. Wunderlich, 194 Minn. 35, 259 N. W. 399; Melhus v. Sam Johnson & Sons Fisheries Co. Inc. 188 Minn. 304, 247 N. W. 2; and Turner v. Schumacher Motor Express, Inc. 230 Minn. 172, 41 N. W. (2d) 182."

To the same effect, see 1A Larson, Workmen's Compensation Law, c. 48:00; and 3 Schneider, Workmen's Compensation Text, § 782. The Larson treatise emphasizes the importance of the employee's consent as follows:

"This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit." § 48:10.

But ADM argued to this court that the consent criterion has been superseded and implicitly repudiated by recent decisions in Minnesota which have identified the employer's right to control as determinative.

The principal cases relied upon by ADM are Nepstad v. Lambert, 235 Minn. 1, 50 N. W. 2d 614 (1951); Lindbery v. J. A. Danens & Son, Inc. 266 Minn. 420, 123 N. W. 2d 695 (1963); Guhlke v. Roberts Truck Lines, 268 Minn. 141, 128 N. W. 2d 324 (1964); Ismil v. L. H. Sowles Co. 295 Minn. 120, 203 N. W. 2d 354 (1972); and St. Claire v. Minnesota Harbor Service, Inc. 211 F. Supp. 521 (D. Minn. 1962) (applying Minnesota law).

In Nepstad, the issue was whether one of the defendants in a tort action was a loaned employee so as to impose vicarious liability on the special employer. In applying the control test, we explained:

"The so-called 'right of control or direction' test assumes to place the responsibility for the servant's negligence upon the em-

ployer having the right to control his actions at the time the negligent act occurs. The theoretical basis for this test is probably the desire to impose the liability upon the employer who was in the best position to prevent the injury." 235 Minn. 10, 50 N. W. 2d 620.

Thus, the Larson treatise discusses the reasons for applying the control test in this context as follows:

"* * * For vicarious liability purposes, the spotlight was entirely on the two employers—what they agreed, how they divided control, how they shared payment, and whose work, as between themselves, was being done. No one paid much attention to the employee or cared whether he had consented to the transfer of his allegiance, since, after all, his rights were not usually as a practical matter involved in the suit." § 48:10.

Ismil and Guhlke involved the same issue and are distinguishable for the same reason.

Lindbery involved a determination whether a worker who was killed when struck by a truck owned by defendant Danens was an employee of Danens or an independent contractor rather than whether he was a loaned servant. Nevertheless, Lindbery is closely analogous because the finding there of an employment relationship had the result of precluding a wrongful death action for the worker's next of kin. Thus, the rights of the employee's next of kin were clearly at stake. This court stated:

"* * * The basic test * * * continues to be whether the contract contemplates performance with or without the right to exercise detailed authoritative control over the manner and means by which the work is to be accomplished." 266 Minn. 422, 123 N. W. 2d 697.

The employee's consent was not mentioned as a relevant consideration. The question, then, is whether there is any reason to distinguish the independent contractor situation in Lindbery from the loaned employee situation in Crawford v. Duluth, M. & I. R. Ry. Co. 220 Minn. 225, 19 N. W. 2d 384 (1945); Pocrnich

v. Snyder Min. Co. 233 Minn. 81, 45 N. W. 2d 794 (1951); and Darvell v. Paul A. Laurence Co. 239 Minn. 55, 57 N. W. 2d 831 (1953), so that the employee's consent would continue to have determinative significance in the latter situation.

We do find a compelling distinction. We begin with the premise that every employment relationship is based on a contract, express or implied, and that the employee's consent is essential to the validity of that contract. Typically, in determining whether a person is an employee or an independent contractor, submission to the employer's right of control would evince consent to an employment relationship. In contrast, such consent is not as easily inferred from submission to control in the loaned employee context because apparent submission may be nothing more than continued obedience to the general employer. Petschow v. Scheid, 259 Minn. 474, 478, 108 N. W. 2d 1, 4 (1961).

Although the Federal court in St. Claire v. Minn. Harbor Service, Inc. 211 F. Supp. 521 (D. Minn. 1962), apparently applied the right to control test as determinative even in the loaned employee context and with the employee's right to sue in tort at stake, the general employer there was Manpower, a labor broker. St. Claire has generally been followed or distinguished on precisely this ground. Accord: Beaver v. Jacuzzi Brothers, Inc. 454 F. 2d 284, 285 (8 Cir. 1972); Renfroe v. Higgins Rack Coating & Mfg. Co. 17 Mich. App. 259, 266, 169 N. W. 2d 326, 329 (1969); Daniels v. MacGregor Co. 2 Ohio St. 2d 89, 94, 206 N. E. 2d 554, 557 (1965); Chickachop v. Manpower, Inc. 84 N. J. Super. 129, 137, 201 A. 2d 90, 95 (1964); Wright v. Habco, Inc. 419 S. W. 2d 34, 36 (Mo. 1967). See, also, Travelers Ins. Co. v. Brown, 338 F. 2d 229 (5 Cir. 1964) (not a labor broker but result explained by peculiar statute at 338 F. 2d 232, note 2). Contra: Hamilton v. Shell Oil Co. 215 So. 2d 21, 22, 23, note 1 (Fla. App. 1968) (labor broker but St. Claire not followed). See, also, Fisher v. City of Seattle, 62 Wash. 2d 800, 384 P. 2d 852 (1963); Kirby v. Union Carbide Corp. 373 F. 2d 590 (4 Cir. 1967) (result controlled by express contract provisions); Blessing v. T. Shriver

& Co. 94 N. J. Super. 426, 228 A. 2d 711 (1967). The significance of the labor broker feature in St. Claire is explained in Chickachop as follows:

"The importance of control by the special employer was stressed in the opinion. But the rule concerning a consent, either express or implied, to a contract with the special employer by the employee was followed. It was found that an implied consent existed and rightly so. Just as in this case, the employee knew he would be hired out to special employers, and accepted such employers just as he accepted the general employer." 84 N. J. Super. 137, 201 A. 2d 95.

While it may be appropriate in labor broker cases like St. Claire and Chickachop to infer the employee's consent to a special employment relationship as a matter of law, such an inference is not warranted when the general employer, as here, is a contractor offering a service. In cases such as this one, there must be actual indicia of consent.

As indicated in the quoted language from Pocrnich v. Snyder Min. Co. 233 Minn. 81, 84, 45 N. W. 2d 794, 796 (1951), quoted above, consent need not be express. Rademaker's submission to Fankhauser's control may have evinced his consent to a special employment relationship with ADM. But his submission may also have evinced nothing more than continued obedience to Cuddy. The trial court did find that Rademaker consented to the new relationship, but it is clear from the way the case was argued by the parties at the hearing on the motion for summary judgment and from the trial court's memorandum that the factor of Rademaker's consent was treated as only one of many elements of the control test. It was not given the independent threshold significance emphasized in this opinion. Had the trial court looked beyond the control test and given proper significance to the factor of consent, it might not have found that Rademaker was a loaned employee. Indeed, the trial court might well have decided in its discretion that the issue should be left to the trier of fact, despite the circumstance that both parties had

agreed the issue was ripe for summary judgment. We do not wish to limit the trial court's discretion by indicating whether in our view the issue was ripe. We do, however, find it necessary to remand this case to give the trial court an opportunity to reconsider its order in light of the emphasis we have placed herein on the employee's consent.

## II

Apart from the control test which we have distinguished above, the trial court considered it important that Cuddy's hourly labor charge to ADM included a 20-percent overhead charge to pay for workers' compensation insurance and other items. The St. Claire case also emphasized this factor, noting:

"* * * In other words, the plaintiff is suing in tort the man who paid for his Workman's Compensation. * * * The defendant paid part of this [overhead charge] for the sole and express purpose of not having to defend actions such as the one which has been brought here. This case strikes at the heart of the Workmen's Compensation law; this case is in unequivocal opposition to the well-known principles on which Workman's Compensation is founded." (Italics omitted.) 211 F. Supp. 528.

While we do not say that this result is inappropriate in cases where the general employer is a labor broker like Manpower, we do hold that the trial court in the case at bar attached unwarranted significance to the overhead charge. Such an overhead charge is typical when purchasing a service from a contractor like Cuddy and would be charged even in cases where there are no other indicia of a special employment relationship.

Reversed and remanded.