# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1294

_____

| | | |
|---|---|---|
| John Lundstrom; Cori Lundstrom, | * | |
| | * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Maguire Tank, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: October 5, 2007
Filed: December 4, 2007

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

John Lundstrom, an employee of Truck Crane Service Company (Truck Crane), was injured on a job site operated by Maguire Tank, Inc. Lundstrom collected workers' compensation from Truck Crane. He then sued Maguire Tank, asserting that its negligence had caused his injury. Maguire Tank asserted that under the loaned servant doctrine it was Lundstrom's special employer. Under that doctrine, Maguire Tank was liable to Lundstrom under workers' compensation statutes, but was also protected by those statutes from any further liability. The district court granted Maguire Tank's motion for summary judgment after concluding as a matter of law that Lundstrom was a loaned servant of Maguire Tank. Lundstrom appeals that decision, and we reverse.

## I. BACKGROUND

Truck Crane rents cranes to construction contractors, transports its cranes to and from job sites, and operates the crane while on-site. Maguire Tank, a general contractor, employed Truck Crane to lift into place various parts of a water tower.

Lundstrom had no set job description, but filled various roles as required by Truck Crane, which included operating, maintaining, and transporting cranes. Lundstrom began working at the Maguire Tank job on September 8, 2003, acting as an "oiler," whose responsibilities included ensuring that the 300-ton crane functioned properly and that the rigging was sufficient on all the lifts, as well as generally being the crane operator's eyes and ears on the ground. He was also responsible for preparing the crane for transport and for transporting it. Truck Crane's crane operator on the site was Mark Tollefson. Randy Smith was Maguire Tank's foreman in charge of the site. Smith briefly discussed with Tollefson where the crane would be located on the site and at what time they would begin lifting, but did not tell Tollefson how to operate the crane. Smith did not give any special directions to Lundstrom about how he should perform his job functions as an oiler. Smith did not recall even speaking with Lundstrom at the job site. The lifting was finished sometime between 4:00 p.m. and 7:30 p.m. The next morning, September 9, the Truck Crane employees, including Lundstrom, packed the crane for transport without direction from Smith or any other Maguire Tank employee. Smith then discussed the time sheets for the job with Tollefson and signed them. At this point, both Smith and Tollefson believed that Truck Crane's work for Maguire Tank was completed.

While Truck Crane employees were packing the crane for transport, a Maguire Tank worker began cutting the lifting lugs from the water tower. Lifting lugs are heavy metal objects that, when welded onto pieces that must be lifted by a crane, allow the crane's lifting ropes or cables to be attached to the piece. After the pieces are lifted into place, the lifting lugs are cut off. Shortly after Smith had signed the

time sheets with Tollefson, Lundstrom was either getting some drinking water or smoking a cigarette and saying goodbye to some Maguire Tank workers when a lifting lug fell some 140 feet and struck Lundstrom's left arm, causing severe injuries.

## II.    ANALYSIS

We review *de novo* a district court's grant of summary judgment. Gretillat v. Care Initiatives, 481 F.3d 649, 652 (8th Cir. 2007). We view the facts in the light most favorable to the nonmoving party, and we will affirm if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Gretillat, 481 F.3d at 652.

The loaned servant doctrine provides that "if an employer lends an employee to another for the performance of some special service, then that employee, with respect to that special service, may become the employee of the person to whom his services have been lent." Newland v. Overland Express, Inc., 295 N.W.2d 615, 618 (Minn. 1980). This doctrine applies so long as: "(1) the employee has made a contract for hire, express or implied, with the special employer; (2) the work being done is essentially that of the special employer; and (3) the special employer has the right to control the details of the work." Id.

## A.    CONTRACT FOR HIRE

Maguire Tank is not entitled to judgment as a matter of law that Lundstrom made an implied contract for hire with Maguire Tank. A contract for hire is made only if the employee consents to the alleged special employment relationship. Newland, 295 N.W.2d at 618. The burden of proving such consent is on the party invoking the doctrine. Id. For the purpose of this appeal, there is no express contract between Lundstrom and Maguire Tank.

The basis for implying consent is the employee's unequivocal acceptance of the detailed control of his work by the special employer, which has been held to exist as a matter of law in only two or three situations in Minnesota. See id. at 635 n.1; Danek v. Meldrum Mfg. and Eng'g Co., Inc., 252 N.W.2d 255, 259-60 (Minn. 1977). The first is when a labor broker is the general employer, e.g., Danek, 252 N.W.2d at 259-60, but Maguire Tank concedes that Truck Crane is not a labor broker. The second is when the general employer effectively functioned as a labor broker, e.g., Miller v. Federated Mut. Ins. Co., 264 N.W.2d 631, 634 (Minn. 1978), but that is not the case here, either.

As a third possible situation, Maguire Tank argues that acceptance of detailed control has been held to exist as a matter of law in cases involving the operation of cranes. The two cases Maguire Tank offers as examples are Nepstad v. Lambert, 50 N.W.2d 614 (Minn. 1951), and Teska v. Potlatch Corp., 184 F. Supp. 2d 913 (D. Minn. 2002). Nepstad is not controlling because it applied Wisconsin law. See Nepstad, 50 N.W.2d at 620. Teska was a federal district court decision that relied heavily on Nepstad and that made no reference to Rademaker v. Archer Daniels Midland Co., 247 N.W.2d 28 (Minn. 1976), which emphasized the importance of consent. See Teska, 184 F. Supp. 2d at 927-929. Although Nepstad and Teska discuss, and are cited for, the second and third elements of the loaned servant doctrine, neither case discussed the consent requirement. Even if they can be read as consistent with Minnesota law by assuming that their silence regarding the element of consent indicates that they implied the employee's consent to the special employment relationship as a matter of law, these cases do not aid Maguire Tank. They are unavailing because the level of control exercised in Nepstad and Teska is substantially dissimilar to any control that may have been exercised in this case. See Nepstad, 50 N.W.2d at 622-23 ("Detailed authoritative control must be distinguished from mere designation of work or suggestions made incident to encouraging cooperation . . . ."); Teska, 184 F. Supp. 2d at 929. In both of those cases, the crane operators were loaned servants as a matter of law while they made "blind lifts," during which they moved

the crane exactly and only as instructed by the special employer.  See Teska, 184 F. Supp. 2d at 929; see also Nepstad, 50 N.W.2d at 617.  Maguire Tank has not alleged that it actually controlled or directed Lundstrom's actions as an oiler, much less that any actual control was similar enough in degree to that exercised in Nepstad and Teska to warrant applying those cases here.

The importance of actual indicia of consent is shown in Rademaker, 247 N.W.2d 28, in which the Supreme Court of Minnesota remanded for a determination whether Rademaker's work as a steamfitter on a construction project under the exclusive control of another employer for about a year and a half demonstrated consent to a special employment relationship.  Id. at 29, 32.  Even on those facts, the court refused to imply consent as a matter of law because that "is not warranted when the general employer, as here, is a contractor offering a service.  In cases such as this one, there must be actual indicia of consent."  Id.  Lundstrom worked for little more than one day and, more importantly, took no instructions from any Maguire Tank employee regarding how to do his job.  As noted earlier, Smith does not recall even talking to Lundstrom during the job.  If Rademaker did not impliedly consent as a matter of law to a special employment relationship, neither did Lundstrom.

B.    WHOSE WORK WAS ESSENTIALLY BEING DONE

When the facts are viewed in the light most favorable to Lundstrom, they do not entitle Maguire Tank to a judgment as a matter of law that Lundstrom was essentially doing the work of Maguire Tank at the time he was injured.  See Newland, 295 N.W.2d at 618.  Viewed in that light, Lundstrom either was not working or had completed all his work for Maguire Tank at the time of the injury.  Both Smith and Tollefson believed that once the papers were signed, the job was completed.  Beyond this formality, all the lifting had been finished the day before the injury, and all the preparation of the crane for transport had been completed that morning before the injury.  All that was left for Lundstrom, or any other Truck Crane employee, to do was

get into the truck and drive away. To the extent that driving away is work, and provided that we ignore the fact that Lundstrom had not actually begun driving at the time he was injured, returning the crane to Truck Crane so that it could be rented to other customers could well be considered Truck Crane's work and not Maguire Tank's. Accordingly, it was error to find as a matter of law that Lundstrom was doing Maguire Tank's work.

## C. RIGHT TO CONTROL DETAILS OF WORK

Maguire Tank's conclusion that it had the right to exercise detailed control of the work being done is not justified by the facts when they are viewed in the light most favorable to Lundstrom. See Newland, 295 N.W.2d at 618. As a preliminary matter, the object of this inquiry is to discover whether Maguire Tank had the right to control the details of Lundstrom's work at the time of the injury. Logically, if the goal of the test is to determine Lundstrom's employment status, then the test must focus on who could control his actions, not on whether Maguire Tank had the right to control the work done by anyone else. See, e.g., Danek, 252 N.W.2d at 258-59.

As discussed above, Maguire Tank did not actually exercise detailed control over Lundstrom. The only evidence that Maguire Tank possessed an unexercised right to control the details of Lundstrom's work is that: (1) Lundstrom recognized that Smith was in charge of the job site and that he, Lundstrom, was there to provide a service to Maguire Tank; (2) Lundstrom acknowledged that he would have moved his truck if Smith had asked him to; and (3) Lundstrom may have asked permission to get some water from Maguire Tank's water cooler immediately before the injury occurred. Viewed in the light most favorable to Lundstrom, these facts do not appear to go beyond the general deference that any subcontractor would give a general contractor. Lundstrom's job duties were to set up, maintain, pack up, and move the crane, as well as to check the rigging on lifts and serve as the eyes and ears for the crane operator. There is no indication that Smith ever spoke to Lundstrom, much less

-6-

that anyone from Maguire Tank ever actually directed Lundstrom on how to perform any of his duties. Nor is there any proffered or readily apparent reason why Maguire Tank would give, or believe that it had the right to give, such directions in light of the expertise that Truck Crane's employees have in transporting and maintaining cranes. Accordingly, there is no basis on the present record to find as a matter of law that Maguire Tank had the right to control the details of Lundstrom's work, and thus summary judgment should not have been entered to that effect.

The grant of summary judgment is reversed, and the case is remanded to the district court for further proceedings.

_____